IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**SUNRISE ENERGY, LLC**, )
)
    Plaintiff, )
)
    v. ) 2:14cv618
) **Electronic Filing**
**PPL CORPORATION** and )
**PPL ELECTRIC UTILITIES** )
**CORPORATION**, )
)
    Defendants. )

# **OPINION**

Sunrise Energy, LLC ("plaintiff") commenced this action against PPL Corporation ("PPL") and PPL Electric Utilities Corporation ("PPLEU") (collectively "defendants") seeking redress for defendants' alleged violation of constitutional rights in denying or failing to approve plaintiff's applications made pursuant to Pennsylvania's Alternative Energy Portfolio Standards Act, 73 Pa. Cons. Stat. §§ 1648.1-1648.8 (the "Act"). Plaintiff asserts claims under the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, for deprivation of its substantive due process and equal protection rights in violation of the Fourteenth Amendment and state law claims for tortious interference, unfair competition, direct violation of the Act and declaratory judgment. Presently before the court is defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion will be granted.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868

F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. <u>Id</u>. at 555-56. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are merely consistent with a defendant's liability. <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555). Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. <u>Id.</u> at 678; <u>see also</u> <u>Twombly</u>, 550 U.S. at 563 n.8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005) (quoting <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 741 (1975))); <u>accord</u> <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1997) ("courts,

when examining 12(b)(6) motions, have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'").

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: stating a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. . . . [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 234; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("'The complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 234) (internal citations omitted). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

The record read in the light most favorable to plaintiff establishes the background set forth below. Sunrise Energy LLC "was founded with the mission of developing and operating solar power facilities that serve as customer-generators under the Act." (Complaint at ¶ 24). According to its preamble, the Act was intended to provide "for the sale of electric energy generated from renewable and environmentally beneficial sources, for the acquisition of electric energy generated from renewable and environmentally beneficial sources by electric distribution and supply companies and for the powers and duties of the Pennsylvania Public Utility

Commission" (the "PUC"). 2004 Pa. Legis. Serv. Act 2004-213 (S.B. 1030). In pursuit of these goals, the Act implemented certain milestones for the minimum utilization of alternative energy sources by electric distribution companies ("EDCs") and electric generation suppliers. 73 Pa. Cons. Stat § 1648.3.

Relevant to the instant matter, the Act provides for "net metering," which is defined as "[t]he means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by a customer-generator when any portion of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator's requirements for electricity."[1] 73 Pa. Cons. Stat. § 1648.2. The Act defines a "customer-generator" primarily as "[a] nonutility owner or operator of a net metered distributed generation system." 73 Pa. Cons. Stat. § 1648.2.

In short, net metering permits a customer-generator to sell any cumulative yearly excess of energy generated by an alternative energy system back to its EDC, receiving "full retail value for all energy produced." 73 Pa. Cons. Stat. § 1648.5. The PUC was tasked with promulgating the rules that would govern this practice. Id.

After adopting a final rulemaking order on June 22, 2006, the PUC's first set of regulations took effect on December 15, 2006. 36 Pa. Bull. 7574. After amendment, the present form of these regulations became effective on November 29, 2008. 52 Pa. Code §§ 75.1-75.70 (the "Regulations").

On February 20, 2014, the PUC issued a proposed rulemaking order recommending extensive revisions to the regulations governing net metering. See 44 Pa. Bull. 4179. These changes have yet to take effect. See 44 Pa. Bull. 6730. The proposed changes include

---

[1] Under the Act, alternative energy generating systems include those that utilize solar, wind and geothermal energy. 73 Pa. Cons. Stat. § 1648.2.

4

requirements that (1) customer-generators have a need for electricity beyond what is needed to operate the alternative energy system (a "non-generational load") and (2) alternative energy systems be sized to generate no more than 110 percent of the customer-generator's annual electric consumption. 44 Pa. Bull. 4179. These changes would not affect the general process under which a customer wishing to net meter must seek approval from its EDC to do so. 52 Pa. Code § 75.32.

Plaintiff has operated one 950 kilowatt solar power facility utilizing the Act's current net metering provisions since 2010 in the service territory of EDC West Penn Power. (Complaint at ¶ 26). Desiring to construct an additional 1.95 megawatt facility in 2014, plaintiff investigated three potential sites. PPLEU was the EDC for each of these sites. (Id., at ¶¶ 29, 32, 34). These properties were located in Beavertown, East Berwick, and Beach Haven, Pennsylvania. (Id., at ¶ 30).

Plaintiff submitted its first application for net metering to PPLEU for the Beavertown property on March 11, 2014. (Doc. No. 1-2, at p. 3). PPLEU denied this application on March 25, 2014, explaining that the proposal did not meet the intent of the Act due to the absence of a "non-generational load." (Doc. No. 1-5, at p. 1). Plaintiff then filed its second and third applications on March 30 and April 16, 2014, for the East Berwick and Beach Haven sites. (Doc. Nos. 1-3, at p. 3; 1-4, at p. 3). PPLEU did not deny these applications, but instead responded by issuing separate letters for each of plaintiff's three applications. These letters explained that "substantial uncertainty regarding the requirements to qualify as a 'customer-generator'" made it unclear whether each application qualified for net metering.[2] (Doc. Nos. 1-6,

---

[2] These letters were sent as attachments to emails and were undated. The email attaching the letters for the Beavertown and East Berwick applications was sent on April 14, 2014. (Doc. No. 13-3, at p. 2). The letter in response to the Beach Haven application was attached to an email

5

1-7, 1-8). These letters further advised that PPLEU intended to file a pleading with the PUC seeking determinations on plaintiff's applications. (Id.). Plaintiff has been unable to move forward with any of its proposed projects, as each is contingent upon receiving approval to net meter. (Complaint at ¶¶ 33, 45).

PPLEU filed a petition with the PUC on May 9, 2014, seeking a declaratory order to resolve its uncertainty as to the ability of plaintiff and another similar applicant to take part in net metering. (Doc. No. 13-4, at p. 2). Four days later, plaintiff filed the instant action. (Doc. No. 1).

Plaintiff asserts five claims in its Complaint. At Count I, plaintiff advances a § 1983 claim, alleging that defendants, as state actors, violated its Fourteenth Amendment substantive due process and equal protection rights by denying its net metering applications and treating other customer-generators more favorably. (Id., at ¶¶ 46-73). At Count II, plaintiff seeks a declaratory judgment stating that customer-generators are not required to have a non-generational load in order to net meter under the Act. (Id., at ¶¶ 74-81). Count III asserts a claim for "tortious interference with existing and potential contracts," on the ground that defendants' denials of plaintiff's applications have interfered with a contract guaranteed by the Act. (Id., at ¶¶ 82-93). Count IV purports to bring a direct cause of action under the Act premised on plaintiff having met all of the Act's requirements for net metering, and yet being excluded from doing so. (Id., at ¶¶ 94-102). Finally, plaintiff asserts a claim for unfair competition at Count V, contending that defendants "have engaged in conduct that is contrary to honest, industrial and commercial practices." (Id., at ¶¶ 103-07).

Defendants seek dismissal of plaintiff's claims on a number of grounds. As to the federal

---

sent on April 30, 2014. (Id., at p. 7).

claim, they contend that all claims against PPL must be dismissed because no direct action by PPL has been alleged and liability cannot be predicated solely on *respondeat superior*. Plaintiff's § 1983 claim must be dismissed because neither defendant acted under color of state law and defendants are entitled to qualified immunity in any event. In the alternative, this court should abstain.

Moreover, defendants maintain that the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims because all federal claims must be dismissed. Even assuming supplemental jurisdiction, each of plaintiff's state law claims fails. A declaratory judgment would be improper in light of the pending PUC proceeding. No reasonably probable contract with a third party can be alleged to support a claim for tortious interference. Finally, defendants maintain that plaintiff's remaining state law claims fail because (1) a private cause of action cannot be based on a violation of the Act and (2) Pennsylvania does not recognize the tort of unfair competition.

Plaintiff contends that defendants' conduct in enforcing a state regulatory scheme is state action, particularly where the power to do so has been delegated by the PUC. Defendants' qualified immunity defense fails in light of plaintiff's clearly established right to net meter under the Act. Further, abstention would be improper given the absence of (1) an unsettled question of state law and (2) "extraordinary circumstances."

Although conceding that the exercise of supplemental jurisdiction would be proper only if the federal claims are heard, plaintiff argues that each state law claim survives defendants' motion. Specifically, a declaratory judgment would be proper notwithstanding the pending PUC proceeding because this court has jurisdiction over closely intertwined claims. The tortious interference claim is supported by an "absolute certainty" of contractual relationships with third

parties as well as with defendants. Further, as a customer-generator, plaintiff may maintain a claim for violation of the Act. Finally, while no Pennsylvania appellate court has recognized the tort of unfair competition, plaintiff asserts that the Pennsylvania Courts of Common Pleas have done so in similar circumstances.

Plaintiff cannot plead sufficient facts to maintain a § 1983 claim. In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[3] Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law deprived him of a federal right.") (citing Groman, 47 F.3d at 633).

In any § 1983 claim, "the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) (citations omitted). Here, plaintiff alleges violations of its substantive due process and equal protection rights guaranteed by the Fourteenth Amendment. Defendants do not challenge plaintiff's invocation of these constitutional rights. Consequently, the court will assume that plaintiff's allegations set forth a plausible violation of these rights.

To satisfy the second element of its § 1983 claim, plaintiff must show that defendants

---

[3] Section 1983 creates liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

8

acted under color of state law.  See Kneipp, 95 F.3d at 1204.  The Supreme Court has observed that the criteria for determining the presence of state action lacks rigid simplicity.[4]  Brentwood Acad. v. Tennessee Secondary Sch. Ass'n, 531 U.S. 288, 296 (2001).  Over the years the Court has established a number of approaches to answer the general question of whether there is a sufficiently "close nexus between the State and the challenged action [so] that seemingly private behavior may be fairly treated as that of the State itself."  Id.  (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)).  It has identified a host of factors that can "bear on the fairness of such an attribution," such as when (1) the challenged activity results from the state's exercise of coercive power, (2) the state provides significant encouragement, either overt or covert or (3) a private party becomes a willful participant in joint activity.  Id. (collecting cases in support).

In Crissman v. Dover Downs Entertainment Inc., the United States Court of Appeals for the Third Circuit followed Brentwood's approach to evaluating allegations of state action by private parties.  289 F.3d 231, 239 (3d Cir. 2002).  Regardless of whether the approach is treated as "tests" or "facts," "Brentwood directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'"[5]  Id. (quoting Brentwood, 531 U.S. at 295 (quoting Blum v. Yaretsky, 457 U.S.

---

[4] The Court has explained that conduct which constitutes "state action" is also "action under color of state law and will support a suit under § 1983."  Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982).

[5] The Court pointed out in Lugar that it has never been clear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation." 457 U.S. at 939; see also Groman, 47 F.3d at 639 n.16.  Brentwood appears to embrace the second understanding.  Crissman, 289 F.3d at 239 n.12.

9

991, 1004 (1982) (emphasis in original)). In other words, the basic question is whether the challenged act can be "fairly attributed to the state." Crissman, 289 F.3d at 239 (citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)).

Brentwood highlighted Lugar as an example of when private party conduct may be fairly attributed to the state under the theory of joint activity. Brentwood, 531 U.S. at 295. Lugar set forth a two-part approach to guide the fact-intensive inquiry in this area: "[f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible" and "[s]econd the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar, 457 U.S. at 937. Although these two principles are related, they are not the same. Id. They "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions" and "diverge when the constitutional claim is directed against a party without such apparent authority, *i.e.* a private party." Id. (citing Monroe v. Pape, 365 U.S. 167, 172 (1961)).

Specifically with respect to private party conduct, the Court has found state action to be lacking at the first part of the analysis when the relevant offending decisions of a private party were unconnected with any governmental decision or regulation. Id. at 937-38 (discussing Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972)). Even when private actions are purported to have been taken in accordance with a state statute, a finding of state action is precluded when the private party improperly invoked that statute. Id. at 940-41 ("private misuse of a state statute does not describe conduct that can be attributed to the State"). Once the analysis progresses to

part two, the Court has held that even "[a]ction by a private party pursuant to [a] statute, without something more, [i]s not sufficient to justify a characterization of that party as a 'state actor.'" Id. at 938-39 (discussing Flagg Brothers Inc. v. Brooks, 436 U.S. 149 (1978) (emphasis in original). The Luger Court then listed several ways in which the "something more" might be satisfied: the public function test, the state compulsion test, the nexus test and the joint action test. Id. at 939 (collecting cases).

Under Lugar, if alleged misconduct arises from a violation of a state statute or scheme that is valid, improper or unlawful invocation/utilization of the scheme is not enough to make the private party a state actor. Benn v. Universal Health System, Inc, 371 F.3d 165, 172 (3d Cir. 2004) (a private party's invocation of a statute without grounds to do so cannot "be attributed to a state rule or decision."). This principle extends to private parties that defectively or deficiently perform a prerequisite duty or obligation mandated by or under a state statute or scheme. Id. In contrast, allegations of joint participation in carrying out a state statute or scheme that is itself constitutionally defective states a claim for a due process deprivation. Lugar, 457 U.S. at 942; accord Cruz v. Donnelly, 727 F.2d 79, 82 (3d Cir. 1984) (where a state system requires a state official or body to act based solely on a private actor's judgment, "a private actor's mere invocation of state power renders that party's conduct actionable [as a joint actor with the state] under § 1983.").

A necessary characteristic to proceed under a joint participation approach is actual participation in the relevant conduct by state officials and the private party. See Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 600 (3d Cir. 1979) ("only when the state officials with delegated authority to enforce state laws or regulations participate with management in the decisional process . . . is the requisite nexus under Jackson established."). Conspiratorial

11

conduct likewise can constitute joint action, satisfying the two-part analysis highlighted in Lugar. Lugar, 457 U.S. at 931 (quoting Adickes, 398 U.S. 144, 152 (1970) (a "private party's joint participation with a state official in a conspiracy to discriminate would constitute both 'state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights' and action 'under color of law for purposes of [§ 1983].'").

Under what the Luger Court referred to as the "state compulsion" test, id. at 939, state action by a private party can also be found "when the State, by its law, has compelled the act," Adickes, 398 U.S. at 170. "Under this approach, however, state action will be found only 'when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private decision must in law be deemed that of the State;' 'mere approval of or acquiescence in' the decision is not enough." McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 525 (3d Cir. 1994) (quoting Blum, 457 U.S. at 1004). Thus, in order for a private actor's decision to be attributed to the state, the state must have in some way forced the particular result in question. See Blum, 457 U.S. at 1008 (finding no state action when decisions to discharge or transfer particular patients "ultimately turn[ed] on medical judgments made by private parties according to professional standards that [we]re not established by the State."); Jackson, 419 U.S. 345, 357 ("Approval by a state utility commission of . . . a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'"); McKeesport Hosp., 24 F.3d at 525-26 (private accreditation body not a state actor when its decision to revoke a program's accreditation was based on private standards and state law recognized but did not dictate or influence the decision).

Finally, under the "public function" test, action under color of state law may be found

when a private party "has been delegated . . . a power 'traditionally exclusively reserved to the State.'" McKeesport Hosp., 24 F.3d at 524 (quoting Flagg Brothers, 436 U.S. at 157). Recognition of private party state action under this doctrine has been confined to functions such as the conducting of elections or the performance of actual government functions. Flagg Brothers, 436 U.S. at 158-59.

Plaintiff's assertions that defendants acted under color of state law are wide of the mark. Their arguments are premised on defendants' exercise of the authority to consider and dispose of applications for net metering, which was delegated by the PUC. (Doc. No. 19, at pp. 9-19). Plaintiff contends that "[c]learly enforcement in this regard must be qualified as state action." (Id., at p 18). Defendants respond that "[t]his is not a 'delegation' of state authority; it is simply state regulation of private action." (Doc. No. 21, at p. 9). The court agrees with defendants.

In Jackson, the Court expressly acknowledged that "the supplying of utility service is not traditionally the exclusive prerogative of the State." Jackson, 419 U.S. at 353. Thus, a public utility must also exercise some separate power "traditionally associated with sovereignty, such as eminent domain," before it can be recognized as a state actor under the "public function" test. Id. The Third Circuit has drawn a distinction in this area. On one hand, it recognized that a delegation of state authority to "enforce" regulations "in the sense of actual policing or active governmental or official 'enforcement' of rules and regulations" can serve as such a basis for finding state action by the delegee. Crissman, 289 F.3d at 247. On the other, merely being tasked with "oversee[ing] compliance" with regulations is not traditional enforcement activity that will support such a finding. Id.

The authority delegated to EDCs by the PUC is not one "which is traditionally associated with sovereignty." Jackson, 419 U.S. at 353. Supplying and/or terminating utility service is not

considered to be an exercise of sovereign authority.  Id.  It follows, *a fortiori*, that the subsidiary authority of a utility provider to determine whether applications to interconnect with its power grid comply with the established regulations does not meet this standard.

Moreover, nothing within the Regulations delegates to the EDCs a form of "enforcement" authority that could qualify as a "public function."  See Crissman, 289 F.3d at 247.  To the contrary, EDCs are merely tasked with overseeing a net metering application's compliance with the Regulations.  Id.  Given all of this, state action by defendants cannot be based on their ability to make erroneous decisions concerning net metering applications.  See Benn, 371 F.3d at 172 ("private misuse of a state statute does not describe conduct that can be attributed to the State").

Likewise, the context of the parties' dispute precludes a reasonable inference of "joint participation" between defendants and the state.  As discussed above, the inquiry into whether the challenged conduct can be fairly attributed to the state is a fact-intensive one.  Crissman, 289 F.3d at 239 (citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)).  Plaintiff acknowledges this inquiry, but fails to allege any facts in support of a joint effort between the PUC and PPLEU to deny plaintiff's applications.  (Doc. No. 19, at p. 17).  Instead, plaintiff explains in its brief that "[i]t is not yet clear, and will not be so without discovery, the extent to which the PUC was involved with PPL's decision."  (Id., at p. 19).  In its only other statement related to an inferred joint venture plaintiff surmises that "it would seem that PPL (and other EDCs for that matter) are actively working with the PUC to deny access to Sunrise utilizing net metering for its solar plants."  (Id., at p. 8).  In other words, plaintiff has alluded to nothing more than mere conjecture and cannot identify any fact which raises a reasonable inference that the PUC actually participated in evaluating plaintiff's applications (let alone directed PPLEU to reach a particular decision).

These conclusory assertions that "the PUC was involved" and that PPL is "actively working with the PUC to deny access" stop short of alleging factual matter that plausibly shows the PUC jointly participated in PPLEU's decisions to deny plaintiff's applications. Of course, such "threadbare recitals . . . supported by mere conclusory statements, do not suffice." See Iqbal, 556 U.S. at 678.

It is *possible* that discovery could uncover some joint venture between defendants and the PUC. But under Twombly, this mere possibility is insufficient to make a showing of joint participation that is *plausible* on its face. Without sufficient factual matter to make a plausible showing that the PUC "participate[d] with [defendants] in the decisional process," plaintiff's claim cannot advance based on a theory of joint participation. See Fitzgerald, 607 F.2d at 600 ("We hold today that it is only when the state officials with delegated authority to enforce state laws or regulations participate with management in the decisional process . . . is the requisite nexus under Jackson established.").

Finally, state action by defendants cannot be based on the PUC having compelled the denial of plaintiff's applications through the Regulations. To be sure, when state law actually dictates or influences particular private decisions or when such decisions are made according to standards established by the state, state action may be found. McKeesport Hosp., 24 F.3d at 525 (citing Blum, 457 U.S. at 1008). But private decisions generally are not deemed to be the product of state action, even when the state approves or acquiesces in them. Id. (the exercise of coercive power or the provision of significant encouragement is necessary under the state compulsion approach; "'mere approval of or acquiescence in' the decision is not enough.") (quoting Blum, 457 U.S. at 1004).

Plaintiff's averments sufficiently undermine any basis for proceeding under a compulsion

15

approach. It must be assumed that plaintiff's proposed facilities qualify as customer-generators, as nothing within the Act or the Regulations presently requires a customer-generator to have a non-generational load. (Doc. No. 19, at pp. 5, 19). However, the lack of a non-generational load is the very basis PPLEU identified for its decisions to first deny and then seek guidance regarding plaintiff's applications. (Doc. Nos. 1-5, 1-6, 1-7, 1-8). It is true that potential changes to the Regulations announced by the PUC would impose such a requirement. 44 Pa. Bull. 4179. But as plaintiff aptly notes, these changes have not even been officially proposed at this point, let alone taken legal effect. (Doc. No. 19, at p. 25). Nowhere does plaintiff suggest that PPLEU's decisions were in any way compelled by the Regulations. In fact, plaintiff argues extensively that defendants' actions were "in violation of the Act" and the Regulations, (id., at p. 8), and specifically attempts to bring a separate cause of action under the Act for these actions, (id., at pp. 29-33). Such violations of a state statute or regulatory scheme cannot be the basis for state action by a private party. See Benn, 371 F.3d at 172 ("private misuse of a state statute does not describe conduct that can be attributed to the State"). And importantly, the occurrence of such violations clearly contradicts any contention that defendants' actions actually were compelled by the Regulations.

Based on the foregoing, plaintiff has failed to set forth a plausible showing of a sufficiently close nexus between the State and defendants' actions under any of the relevant approaches. See Brentwood Acad., 531 U.S. at 296. As such, the court cannot draw a reasonable inference that defendants' actions constituted state action. Dismissal of plaintiff's § 1983 claims therefore is proper.[6] Because plaintiff's § 1983 claims must be dismissed, the court

---

[6] Because the inability to make a plausible showing that defendants acted under color of state law provides an independently sufficient basis for dismissing plaintiff's § 1983 claims, the court need not decide whether defendants also are entitled to qualified immunity or abstention is

will decline to exercise jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). See Stehney v. Perry, 101 F.3d 925, 939 (3d Cir. 1996) (district court properly may decline jurisdiction over pendant state law claims where federal claims have dropped from the case prior to trial, the parties will not be prejudiced by the dismissal of the state law claims, and the interests of judicial economy will be served); Queen City Pizza, Inc. v. Dominos' Pizza, Inc., 124 F.3d 430, 444 (3d Cir. 1997) (decision to dismiss state law claims where all federal claims have been dismissed "is committed to the sound discretion of the district court").[7]

As previously indicated, plaintiff's § 1983 claim is subject to dismissal because (1) under some theories for state action plaintiff cannot as a matter of law show that defendants acted under color of state law and (2) as to other theories plaintiff has failed to plead sufficient factual matter under Twombly's plausibility standard to create a showing that defendants acted under color of state law. Under these later circumstances a plaintiff generally is entitled to seek to cure

---

appropriate.

[7] Plaintiff's ability to pursue its state law claims will not be affected adversely as appropriate state forums are available to address each of plaintiff's concerns. First, plaintiff is actively participating in ongoing proceedings before the PUC to determine whether applicants like plaintiff are eligible to take part in net metering, having filed an Answer/New Matter/Counterclaim to PPLEU's petition. See PUC Docket No. P-2014-2420902. Should plaintiff be dissatisfied with the ultimate decision of the PUC in this matter, it will have the right as an aggrieved party to appeal to the Commonwealth Court of Pennsylvania. 2 Pa. Cons. Stat. § 702; 42 Pa. Cons. Stat. § 763. Second, a dispute process specifically regarding net metering applications is provided for in the Regulations. See 52 Pa. Code § 75.51. If plaintiff believes that its interests are not properly addressed by the existing PUC proceedings, it has the right as a "corporation having an interest in the subject matter" to separately "complain in writing, [to the PUC] setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission." 66 Pa. Cons. Stat. § 701. Again, plaintiff would have the option of appealing any adverse decision by the PUC to the Commonwealth Court. See 2 Pa. Cons. Stat. § 702; 42 Pa. Cons. Stat. § 763. Finally, should plaintiff wish to pursue its state law claims, a Pennsylvania Court of Common Pleas with appropriate venue would be available for that purpose. 42 Pa. Cons. Stat. § 931.

Moreover, plaintiff's state law claims will be dismissed without prejudice to plaintiff's ability to transfer those claims to the appropriate Court of Common Pleas as authorized by 42 Pa. Con. Stat. § 5103(b).

the deficiencies by amendment unless attempting to do so would be futile.  <u>Phillips</u>, 515 F.3d at 236 (citing <u>Grayson v. Mayview State Hospital</u>, 293 F.3d 103, 108 (3d Cir. 2002)).  But given the context and nature of the litigation there is no basis to assume or believe that plaintiff can cure the deficiencies highlighted above.  Accordingly, the complaint will be dismissed and the Clerk of Court will be directed to mark the case closed.  Nevertheless, in order to assure that any decision is not premature, the dismissal will be without prejudice to plaintiff filing a motion to re-open the case and amend its allegations pertaining to state action pursuant to factual averments that cure the deficiencies highlighted in this opinion.

For the reasons set forth above, defendants' motion to dismiss will be granted.  An appropriate order will follow.

<u>Date: March 27, 2015</u>

<u>s/David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc: Robert F. Daley, Esquire
D. Aaron Rihn, Esquire
A. Michael Gianantonio, Esquire
James J. Kutz, Esquire
David B. MacGregor, Esquire
Jason G. Benion, Esquire
Paul E. Russell, Esquire

(*Via CM/ECF Electronic Mail*